# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

RAYMOND M.,

                                 Plaintiff,

      v.                                          5:19-CV-1313
                                                   (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
CHRISTOPHER L. POTTER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 8).

## I.    PROCEDURAL HISTORY

On May 18, 2018, plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning May 6, 2018. (Administrative Transcript ("T") 155-158).  Plaintiff's application was denied initially on July 18, 2018. (T. 88-97). Administrative Law Judge ("ALJ") Robyn L. Hoffman granted plaintiff's request for a hearing and heard plaintiff's testimony on May 1, 2019.  (T. 30-63).  On June 3, 2019, the ALJ issued an order denying plaintiff's claim.  (T. 10-29).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's

request for review on August 26, 2019.  (T. 1-6).

## II.   <u>GENERALLY APPLICABLE LAW</u>

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether,

> despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.   Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'"  *Brault*, 683 F.3d at 448.  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions."  *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   **FACTS**

Plaintiff was born on March 17, 1977, making him 42 years old on the date of the administrative hearing.  (T. 35).  He lived with his wife and their three children, ages 14, 9, and 4.  (T. 36).  Plaintiff served in the United States Army from 1996 until 2012. During his service, plaintiff was deployed to Afghanistan and Iraq as a combat engineer and infantryman, and earned a Purple Heart.  (T. 37, 159, 333).  He was discharged from the Army for medical reasons.  (T. 341).  After leaving the military, he obtained a bachelors degree and a masters degree in social work.  (T. 183, 543, 757).

During his military service, plaintiff had been exposed to repeated physical trauma, including a head injury suffered after his vehicle was hit by a roadside bomb. (T. 188, 332, 341-342).  He was first treated for traumatic brain injury, post-traumatic stress disorder ("PTSD"), anxiety, and depression while in the Army, including a hospitalization in 2011 after experiencing suicidal thoughts.  (T. 338, 543).  He continued with medication management and counseling through the Veterans Health

Administration ("VHA") after leaving the military.  (T. 337-339, 347, 584).

Plaintiff held ten jobs since 2012, including associate at a grocery store, delivery driver for an auto parts retailer, and substance abuse counselor.  (T. 216, 583).  He reported that his PTSD symptoms and other mental impairments had repeatedly interfered with his work, typically resulting in termination or voluntary departures after a few months. (T. 39-41, 223, 315, 583, 757).  His most recent employment,  as a discharge coordinator at a hospital, ended in termination after three months for inadvertently violating medical privacy rules when he mistook one patient for another. (T. 38-39, 757).

The ALJ's decision and the parties' briefs provide a detailed statement of the medical and other evidence of record.  Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   **THE ALJ'S DECISION**

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since his alleged onset date. (T. 15).  At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: left rotator cuff injury; sleep apnea; traumatic brain injury; obesity; depression; anxiety; and PTSD.  (*Id.*)  At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment.  (T. 16-18).

At step four, the ALJ found that plaintiff had the RFC to perform less than the

full range of light work, as defined in 20 C.F.R. §§ 404.1567(b).  (T. 18-22).

Specifically, she found that plaintiff could occasionally lift and carry twenty pounds,

frequently lift and carry ten pounds, sit for up to six hours, and stand or walk for

approximately six hours in an eight hour workday with normal breaks. (T. 18)  Plaintiff

could occasionally climb ladders, ropes, and scaffolds, and can occasionally reach

overhead with his left arm. (*Id*.)  With regard to mental limitations, plaintiff retained the

ability to understand and follow simple instructions and directions; perform simple

tasks independently; maintain attention and concentration for simple tasks; regularly

attend to a routine and maintain a schedule; relate to and interact appropriately with all

others to the extent necessary to carry out simple tasks; and handle simple, repetitive

work-related stress, in that plaintiff could make occasional decisions directly related to

the performance of simple tasks in a position with consistent job duties that did not

require plaintiff to supervise or manage the work of others.  (*Id*.)

Next, the ALJ found that plaintiff was unable to perform his prior relevant work.

(T. 23-24).  However, at step five, using the Medical Vocational Guidelines as a

framework, the ALJ found that "the occupational base for light work is only minimally

eroded by [plaintiff's] additional limitations," so there were jobs existing in significant

numbers in the national economy that plaintiff could perform. (T. 24-25).  Thus, the

ALJ found that plaintiff was not disabled.  (T. 25).

## V.    ISSUES IN CONTENTION

Plaintiff contends that the ALJ erred in her evaluation of plaintiff's mental

functional limitations by improperly relying on an outdated opinion of a non-examining

consulting opinion and rejecting the more restrictive opinions of multiple examining

sources.  (Plaintiff's Brief ("Pl.'s Br.") at 12-21) (Dkt. No. 11).  The Commissioner

contends that the ALJ sufficiently evaluated the evidence of record, and that her

decision was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 4-

23) (Dkt. No. 12).  For the reasons set forth below, the court concludes that the ALJ's

RFC determination was not supported by substantial evidence.  As a result, the ALJ's

analysis at step five and the ultimate finding that plaintiff was not disabled were

tainted.  Accordingly, the court orders a remand for further administrative proceedings

to adequately develop and assess the medical evidence as necessary, in order to

determine an RFC that is properly supported.

## DISCUSSION

### VI.    RFC/EVALUATING MEDICAL EVIDENCE

#### A.    Legal Standards

##### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular

and continuing basis" means eight hours a day, for five days a week, or an equivalent

work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2

(N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)

(quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-

00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v.*

*Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F.

Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R.

§§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v.*

*Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019);

*Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions

plaintiff is capable of performing, and may not simply make conclusory statements

regarding a plaintiff's capacities.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*,

728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v.*

*Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*,

307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a

narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No.

3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing

SSR 96-8p, 1996 WL 374184, at *7).

### 2.    Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended

for claims filed after March 27, 2017, and several of the prior Social Security Rulings,

including SSR 96-2p, have been rescinded.  According to the new regulations, the

Commissioner "will no longer give any specific evidentiary weight to medical opinions;

this includes giving controlling weight to any medical opinion." *Revisions to Rules*

*Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL

168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a),

416.920c(a).  Instead, the Commissioner must consider all medical opinions and

"evaluate their persuasiveness" based on the following five factors: supportability;

consistency; relationship with the claimant; specialization; and "other factors."  20

C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical

sources, deference to specific medical opinions, and assigning "weight" to a medical

opinion, the ALJ must still "articulate how [he or she] considered the medical opinions"

and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at

§§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most important factors

for determining the persuasiveness of medical opinions are consistency and

supportability," which are the "same factors" that formed the foundation of the treating

source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853.  An ALJ is specifically

required to "explain how [he or she] considered the supportability and consistency

factors" for a medical opinion.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  With

respect to "supportability," the new regulations provide that "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical source

are to support his or her medical opinion(s) or prior administrative medical finding(s),

the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion.  *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).  However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B.    Application

As discussed above, plaintiff's application for benefits is governed by the amended regulations that eliminate the treating physician rule because it was filed after March 27, 2017.  In this case, the ALJ considered multiple medical opinions related to plaintiff's physical and mental limitations.  Plaintiff has only challenged the ALJ's evaluation of the mental health opinions.  (Pl. Br. at 12-21).  A summary of these mental health opinions are set out below, in chronological order.  The court will then explain its reasoning for the conclusion that the ALJ's evaluation of those opinions was not supported by substantial evidence.

### 1.     Consultative Examiner Dr. Corey Anne Grassl

Dr. Corey Anne Grassl performed a consultative psychiatric examination of plaintiff on June 25, 2018. (T. 543-546).  Prior to the examination, plaintiff reported frequent awakening, loss of appetite, difficulty with concentration, hopelessness, a depressed mood, and feelings of worthlessness. (T. 543).  He reported experiencing panic attacks three times per week, problems with short and long-term memory, and difficulties with planning and organization. (*Id*.)  Regarding activities of daily living, plaintiff reported that he required his wife's assistance with dressing, bathing, grooming, and household chores such as laundry, shopping, and cooking.  (T. 545).

During the single examination by Dr. Grassl, plaintiff demonstrated a cooperative demeanor and an "adequate" manner of relating.  (T. 544).  He showed a coherent and goal-directed thought process with no evidence of hallucinations, delusions, or paranoia.  (*Id*.)  He had a depressed affect and a "severely dysthymic" mood.  Plaintiff's attention and concentration were intact, and he was able to perform simple calculation and counting exercises. (*Id*.)  His recent and remote memory skills appeared mildly impaired, as plaintiff was able to remember a list of three objects immediately, but only recall two of three after a delay. (T. 545).  He was able to recite a series of four digits forward, but recited no digits backward. (*Id*.)

Based on her examination, Dr. Grassl opined that plaintiff showed "no evidence of limitation in his ability to understand, remember, and apply simple directions and instructions; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions."  (*Id*.)  In Dr. Grassl's opinion, plaintiff was

"markedly limited in his ability to understand, remember, and apply complex directions and instructions; use reason and judgment to make work-related decisions; sustain concentration and perform a task at a consistent pace; and regulate emotions, control behavior, and maintain well-being." (*Id*.)  She further opined that plaintiff was "moderately limited in his ability to interact adequately with supervisors, co-workers and the public and sustain an ordinary routine and regular attendance at work." (*Id*.)  Dr. Grassl concluded that these difficulties were caused by cognitive deficits and psychiatric problems. (*Id*.)  She gave plaintiff a guarded prognosis, and expected his impairments to last more than one year. (T. 546).

The ALJ concluded that Dr. Grassl's opinion was not persuasive. (T. 22).  She found that the moderate and marked limitations described in the consultative examination opinion were "more extreme than, and not consistent with the overall medical evidence, which shows general improvement in symptoms with medication and when [plaintiff] attends treatment." (*Id*.)

### 2.    State Agency Consultant Dr. Howard Ferrin

Dr. Howard Ferrin, a state agency psychological consultant, reviewed plaintiff's then-current medical records and issued a Mental RFC Assessment on July 17, 2018. (T. 80-82).  Based upon that review, Dr. Ferrin opined that plaintiff had no limitations in his ability to remember locations and work-like procedures or his ability to understand and remember very short and simple instructions, and that plaintiff was "not significantly limited" in his ability to understand and remember detailed instructions. (T. 80).  He further opined that plaintiff was "moderately limited" in his ability to

12

perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (T. 80-81).  In addition, he considered plaintiff to be "moderately limited" in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (T. 81). Dr. Ferrin opined that plaintiff had no significant limitations with regard to social interaction, but was moderately limited in his ability to respond appropriately to changes in the work setting.  (T. 81).

Dr. Ferrin explained the factors that influenced his opinion.  (T. 82).  He reviewed Dr. Grassl's June 2018 consultative examination, and noted that plaintiff presented with a severely dysthymic mood and showed mild memory impairment.  (*Id.*) Otherwise, Dr. Ferrin found the consultative examination report to depict plaintiff as fully oriented, with intact attention and concentration, and an average range of intellectual functioning.  (*Id.*)  Dr. Ferrin also cited unspecified VHA records that indicated a generally euthymic mood and no significant cognitive limitation, despite plaintiff's history of traumatic brain injury. (T. 82).  He noted that a speech and language evaluation conducted in January 2018 indicating mild communicative issues, but appeared to "have been based largely upon self-report checklist rather than objective exam findings."  (T. 82, 425).

Dr. Ferrin also relied upon summaries of two prior neuropsychological evaluations in the VAMC records, performed in July 2012 and May 2013. (T. 82, 423) The summary of the July 2012 exam indicated that plaintiff "performs in the normal

range on all cognitive tests despite his lack of consistent and optimal effort throughout testing." (T. 82, 423).  According to the summary of the May 2013 report, plaintiff's low scores were "uninterpretable" due to performance validity concerns. (T. 423).  Dr. Ferrin thus concluded that "even though [plaintiff] scored within the normal range on all cognitive tests, the neuropsychologist apparently opined that [plaintiff's] cognitive test scores likely under-represented [plaintiff's] actual level of his cognitive abilities." (T. 82).

Based on these results and the mental status examinations available in the record, Dr. Ferrin opined that plaintiff "appears capable of understanding and remembering complex work procedures," and despite  ". . . lapses in focus, motivation, and reliability, the frequency, intensity, and duration of these occurrences would not be expected to significantly detract from [plaintiff's] ability to complete work-like procedures."  He also opined that plaintiff was able to relate and respond in an appropriate manner without substantial limitations, and despite "some difficulty coping in stressful circumstances," plaintiff appeared capable of adapting to customary changes in an ordinary work environment. (*Id*.)  In reaching these conclusions, Dr. Ferrin recognized that his opinion was less restrictive than the only other opinion then in the record, from Dr. Grassl. (T. 83).  He explained that he considered Dr. Grassl's opinion to be an overestimate of plaintiff's functional limitations. (*Id.*)

The ALJ found Dr. Ferrin's opinion to be persuasive, in light of the state agency consultant's agency knowledge, expertise in the field, and review of the available record. (T. 22).  The ALJ also found that further development of the record after Dr.

Ferrin's opinion did not suggest any additional limitations that would have changed his analysis, because plaintiff improved with medication despite failing to attend several therapy sessions.  (*Id*.)

### 3.  Examining Psychologist Dr. Michael Thompson

Dr. Michael Thompson, a clinical psychologist, evaluated plaintiff for PTSD on July 20, 2018. (T. 580-588).  He noted that plaintiff's PTSD was characterized by symptoms including hyperarousal episodes, avoidance symptoms, re-experiencing symptoms and negative cognitions. (T. 581).  At the time of the examination, plaintiff reported that he was drinking an average of four to six beers per day in an attempt to self-medicate his symptoms.  (*Id*.)  Upon review of plaintiff's history, Dr. Thompson found that plaintiff had held approximately ten jobs since 2012, and had "been either fired from them [or] left them before he was fired because of his PTSD symptoms."  (T. 583).

During the examination, plaintiff was cooperative and made good eye contact, with a rational and goal-directed thought process. (T. 587).  Plaintiff's basic cognitive functioning presented as grossly intact, and Dr. Thompson estimated that his intellectual skills were in the above-average range. (*Id*.)  Plaintiff's mood was anxious with some distress. (*Id*.)   Plaintiff had a mildly constricted affect and an overall presentation that Dr. Thompson deemed "consistent with the current severity of his PTSD symptoms." (*Id*.)  Upon review of plaintiff's 2012 PTSD evaluation results, Dr. Thompson opined that plaintiff's PTSD symptoms had progressed from moderate to "fully severe."  (*Id*.)  He also opined that plaintiff was "totally and permanently

disabled in terms of his occupational functioning" due to his PTSD symptoms.  (T.
588).  In Dr. Thompson's opinion, the chronicity and marked severity of plaintiff's
symptoms would preclude any capacity for maintaining "even a marginal semblance" of
behavioral or emotional stability in a work setting, whether sedentary or non-sedentary.
(*Id*.)  Dr. Thompson also opined that plaintiff was "experiencing persistent and severe
impairments in all areas of his psychosocial functioning and general quality of life.
Essentially, [plaintiff's] ability to enjoy any daily activity whether solitary [or] social is
severely compromised by his symptoms." (*Id*.)

The ALJ found Dr. Thompson's opinion to be "neither valuable nor persuasive."
(T. 23).  She found that his conclusion that plaintiff provided no specific assessment of
plaintiff's ability to perform work-related activities, and his conclusion regarding
overall disability was an issue reserved to the Commissioner.  (T. 23).

### 4.    Examining Psychologist Dr. Charles Bradshaw

Dr. Charles Bradshaw performed a neuropsychological evaluation of plaintiff on
September 26, 2018.  (T. 675-681).  His assessment included tests for vocabulary,
reading ability, and general intelligence as well as measurements of memory,
depression, and anxiety.  (T. 675).  Dr. Bradshaw observed that plaintiff was fully
oriented and alert, and able to maintain attention.  (T. 675-676).  He saw no evidence of
tangential, disordered, or delusional thinking.  Plaintiff appeared polite, friendly, and
cooperative, and applied "adequate effort" to all test tasks.  (T. 676).  In Dr. Bradshaw's
opinion, the test results were a valid indication of plaintiff's current level of cognitive
functioning.  (*Id*.)

Overall, Dr. Bradshaw found that plaintiff's test results indicated average to above-average cognitive functioning, with variable memory, and severe levels of depression, anxiety, and PTSD. (*Id*.) Dr. Bradshaw opined that the severity of plaintiff's "emotional stress is probably sufficient to compromise his cognitive functioning in his daily activities, particularly in the areas of attention, concentration, learning and recall, which are sensitive to the compromising effects of emotional stress." (T. 679). Based on the examination results, Dr. Bradshaw opined that plaintiff's cognitive difficulties were more likely to be a result of his psychiatric impairments and less likely to be a result of his traumatic brain injury. (*Id*.) He further opined that plaintiff's cognition will improve if his stress can be more effectively treated. (*Id*.)

The ALJ found Dr. Bradshaw's opinion to be persuasive, "insofar as the recommendations based upon testing have been considered in formulating the B criteria and the residual functional capacity, to the extent that these recommendations are consistent with the overall medical evidence of record." (T. 23).

### 5. Treating Psychiatrist Dr. Katherine Cerio

Plaintiff's most recent treating psychiatrist, Dr. Katherine Cerio, prepared a Medical Source Statement dated October 17, 2018. (T. 548-550). As of the date of her opinion, Dr. Cerio had seen plaintiff for a total of seven visits since June 2018. (T. 548). Plaintiff had been treated by other staff at the same VHA facility since July 2016. (*Id*.) At the time of her opinion, plaintiff had been prescribed four psychiatric medications, and was regularly encouraged to participate in individual therapy sessions.

(*Id.*)

Dr. Cerio opined that plaintiff would need to take two or more unscheduled breaks during the workday due to his psychiatric symptoms, and that he would be off-task for more than twenty percent of the workday. (T. 550). She estimated that these impairments would cause plaintiff to miss more than four days per month of work. (*Id.*) In Dr. Cerio's opinion, plaintiff's work-related limitations were primarily psychological, including reduced motivation, decreased attentional capacity, markedly decreased frustration tolerance and angry outbursts, as well as triggers linked to traumas from his wartime service. (*Id.*) Based upon her own treatment experience with plaintiff as well as a review of his prior treatment records, Dr. Cerio opined that plaintiff's impairments had existed and persisted to the same degree since at least May 6, 2018. (T. 551).

The ALJ determined that Dr. Cerio's opinion was not persuasive. (T. 23). She found that the treating psychiatrist's opinion was not consistent with her own treatment notes indicating that plaintiff's symptoms improved with medication, despite several missed therapy appointments. (T. 23). In addition, the ALJ found Dr. Cerio's estimate of time off task and absent from work to be "mere speculation, not supported by her treatment notes, or the evidence of record." (*Id.*)

### 6.   The ALJ's Evaluation of the Medical Opinion Evidence Was Not Supported by Substantial Evidence.

At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency for each of the medical opinions, "pointing to specific evidence in the record supporting those findings." *Jacqueline L.*

*v. Comm'r of Soc. Sec.*, No. 6:19-CV-6786, 2021 WL 243099, at *6.  The ALJ failed to meet this requirement.

The ALJ provided no substantive explanation for her conclusion that Dr. Ferrin's opinion was persuasive, making only general reference to the state agency consultant's expertise and experience, and his review of the available record.  (T. 22).  This omission alone would likely warrant remand.  *See Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (AJN)(KHP), 2021 WL 3633682, at *14 (S.D.N.Y. January 29, 2021) ("Nowhere in the ALJ's decision does she explain, as the new regulations require, what the respective CEs used to support their opinions and reach their ultimate conclusions.")  At least one court has held that such an error cannot be found harmless at this time.  *Id*., 2021 WL 3633682, at *14 ("Given the newness of the regulations, the ALJ's failure to develop the record in significant areas . . . and the ALJ's failure to properly apply the new regulations replacing the treating physician rule, this Court will not engage in a substantial evidence review to determine if the legal errors were harmless.").

This case does not require the court to adopt such a rigid approach, but remand is still required.  The inadequate explanation for the ALJ's reliance on Dr. Ferrin's non-examining opinion clearly leaves pertinent questions unanswered.  *Danette Z. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1273 (ATB), 2020 WL 6700310, at *8 (N.D.N.Y. November 13, 2020)  ("[T]he ALJ's stated reason for affording the most weight to [the non examining consultant's] opinion – '[h]is opinion is supported by his review of the record' - provides little insight into the ALJ's consideration of the conflicting

19

evidence.")

With regard to supportability, the court notes that Dr. Ferrin appears to have heavily relied upon a summary of July 2012 and May 2013 neuropsychological examination of plaintiff, that predated plaintiff's alleged onset date of May 6, 2018 by at least five years. (T. 82, 423). At the time of his review, Dr. Ferrin did not have access to the September 2018 neuropsychological examination of plaintiff conducted by Dr. Thompson, that showed "significantly elevated levels of depression, anxiety and PTSD" "sufficient to account for his cognitive difficulties, particularly in areas of attention, concentration, learning and memory . . ." (T. 676). Moreover, the record includes the full test results from 2018, rather than a mere summary, and includes Dr. Bradshaw's conclusion that the test was "a valid indication of plaintiff's current level of cognitive functioning." (*Id.*) Dr. Bradshaw also opined that plaintiff's cognition will improve if his stress can be "more effectively" treated, suggesting that his symptoms were not controlled at the time of the test.

By itself, "[a] gap of time between when an opinion is rendered and the disability hearing and decision does not automatically invalidate that opinion." *Majdandzic v. Comm'r of Soc. Sec.*, No. 17-CV-1172, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018). However, a "meaningful change" in plaintiff's condition during the gap will do so. *Lamar v. Comm'r of Soc. Sec.*, No. 18-CV-829, 2020 WL 548376, at *3 (W.D.N.Y. Feb. 4, 2020) (emphasis supplied). A consultative opinion may thus become stale "if the claimant's condition deteriorates after the opinion is rendered and before the ALJ issues his decision." *Maxwell H. v. Comm'r of Soc. Sec.*, 1:19-CV-0148 (LEK/CFH);

2020 WL 1187610, at *5 (N.D.N.Y. March 12, 2020) (quoting *Clute ex rel. McGuire v. Comm'r of Soc. Sec.*, No. 18-CV-30, 2018 WL 6715361, at *5 (W.D.N.Y. Dec. 21, 2018).  Given the potential that plaintiff's 2018 neuropsychological test results represent a deterioration in plaintiff's condition, the ALJ should have addressed it in discussing the supportability of Dr. Ferrin's opinion.

With respect to consistency, the ALJ should have addressed the fact that Dr. Ferrin's opinion was an outlier among the medical opinions of record.  A recent survey of district court cases in the Second Circuit applying the amended regulations recognized that many of the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar.  *See Cuevas*, 2021 WL 3633682, at *9 (collecting cases).  For example, "[e]ven though ALJs are no longer directed to afford controlling weight to treating source opinions - no matter how well supported and consistent with the record they may be – the regulations still recognize the 'foundational nature' of the observations of treating sources, and 'consistency with those observations is a factor in determining the value of any [treating source's] opinion.'"  *Shawn H. v. Comm'r of Soc. Sec.,* No. 2:19-CV-113, 2020 WL 3969879, at *6 (D. Vermont July 14, 2020) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)*, see also Jacqueline L. v. Comm'r of Soc. Sec.*, No. 6:19-CV-6786, 2021 WL 243099, at *4 (W.D.N.Y. January 26, 2021).  As the amended regulations note,  "[a] medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder." 20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v).

Dr. Ferrin described his reliance on the objective findings of plaintiff's June 2018 consultative examination, but issued a far less restrictive opinion of plaintiff's functional limitations as compared to Dr. Grassl, who actually conducted the examination. (T. 83).  Dr. Ferrin's opinion was also less restrictive than the subsequent opinions of Dr. Cerio, Dr. Bradshaw, and Dr. Thompson, who had the advantage of examining plaintiff at least once.  *Shawn H.*, 2020 WL 3969879, at *8 (remanding where ALJ relied upon opinion of non-examining consultant who had no opportunity to review treating source opinions that described greater restrictions); *see also Danette Z. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1273 (ATB), 2020 WL 6700310, at *8 (N.D.N.Y. November 13, 2020) (remanding, in part, due to non-examining consultant's inability to review later treating source opinion).  Dr. Ferrin also had no opportunity to review Dr. Cerio's psychiatric treatment notes from July 2018 to September 2018.  *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether agency consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record as required to override treating physician opinion).

The ALJ's evaluation of these examining physician opinions suffers from the same inadequate explanation of her conclusions regarding supportability and consistency. With respect to consulting examiner Dr. Grassl's opinion, the ALJ merely states that her assessment "is more extreme than, and not consistent with, the overall medical evidence, which shows general improvement in symptoms with medication and when the claimant attends treatment." (T. 23).  Likewise, the ALJ found Dr.

22

Bradshaw's opinion persuasive "to the extent that these recommendations are consistent with the overall medical evidence of record." (*Id*.)  The ALJ provided slightly more analysis regarding treating psychiatrist Dr. Cerio, discounting her opinion because it was "not consistent with Dr. Cerio's own treatment notes indicating improvement with medication" and plaintiff's own statements reporting improvement. (*Id*.)  He also discounted Dr. Cerio's estimates that plaintiff would be off task and absent from work as "mere speculation, not supported by her treatment notes, or the evidence of record."  (*Id*.)

In assessing the psychiatric opinion evidence, the ALJ repeatedly considered whether an opinion was consistent with perceived improvements in plaintiff's mental functional limitations. (T. 22-23).  Beyond the vague references to the overall record, it is unclear what evidence supports the ALJ's conclusion that plaintiff's psychiatric symptoms have demonstrably improved.  In June 2018, plaintiff reported that he "feels no better since an increase in his medication," had difficulty sleeping, and felt increased irritability. (T. 627, 629).  Plaintiff also reported that he "has tried to push himself to be more present" but has not been enjoying recent family events such as his son's sporting events and family trips. (T. 627-628).  In July 2018, plaintiff reported that his mood had not improved after an upward adjustment in his medication, and that a downward adjustment in his sleep medication still left him groggy in the morning. (T. 613). Plaintiff reported continued irritability, and intermittent suicidal thoughts. (*Id*.)

Plaintiff generally reported "feeling good" in July 2018, but upon further questioning, he reported that he was feeling depressed, with an increase in irritability

23

and low motivation during the day.  (T. 728).  In August 2018, plaintiff reported that

his mood was "a little better" but described continued struggles with motivation.  (T.

577).  Dr. Cerio observed a dysthymic affect during this counseling session, and began

monitoring plaintiff for possible bipolarity.  (T. 579).  She increased his medication.

(*Id*.)  In September 2018, Dr. Cerio observed that plaintiff mood had "improved

somewhat," although plaintiff merely described it as "ok . . . good."  (T. 672-73).

Plaintiff reported more energy and motivation, but irritability persisted, and caused

some conflict at home.  (T. 671).

 It must be noted again that none of the medical professionals who actually

examined plaintiff have endorsed the significant functional improvement described by

the ALJ.  (T. 546, 550, 588, 679).  In light of the contrary evidence in the record, and

the minimal explanation provided in her decision, it is unclear how the ALJ reached the

opposite conclusion.  "Although an RFC determination is an issue reserved for the

Commissioner, the ALJ is a layperson, and as such is not qualified to assess a

claimant's RFC on the basis of bare medical findings."  *Anderson v. Comm'r of Soc.

Sec.*, No. 19-CV-464, 2020 WL 5593799, at *3 (W.D.N.Y. Sept. 18, 2020) (internal

quotation marks omitted).  "In other words, an ALJ's ability to make inferences about

the functional limitations caused by an impairment does not extend beyond that of an

ordinary layperson.  While an ALJ may render common sense judgments about

functional capacity, she must avoid the temptation to play doctor."  *Duncan v. Comm'r

of Soc. Sec.*, No. 18-CV-369, 2020 WL 1131219, at *2 (W.D.N.Y. Mar. 9, 2020)

(internal quotation marks and brackets omitted).  The ALJ's minimal explanation in her

evaluation of the various mental health opinions supports remand.[1]  To the extent that the ALJ substituted her lay opinion for expert opinion[2] regarding plaintiff's improvement, remand would also be required.

## VII.   NATURE OF REMAND

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate.  *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). This court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits.  *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper

---

[1] On remand, the ALJ should reconsider those portions of Dr. Thompson's opinion that address plaintiff's emotional stability in the workplace. (T. 588).  The ALJ should also consider, on remand, whether the testimony of a vocational expert is required because plaintiff's nonexertional mental impairments "significantly limit the range of work permitted by his exertional limitations."  *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).  *See, e.g., Chaparro v. Colvin*, 156 F. Supp. 3d 517, 538-39 (S.D.N.Y. 2016) ("courts in this district consistently have found it to be reversible error for ALJs to rely solely on the Grids when a plaintiff has moderate psychiatric limitations resulting in nonexertional limitations") (collecting cases); *Michael F. D. v. Saul*, No. 3:19-CV-600 (BKS), 2020 WL 5742704, at *10 (N.D.N.Y. Sept. 25, 2020).

[2] In addition, although the ALJ found that plaintiff's irregular attendance at counseling sessions further undermined Dr. Cerio's opinion, the ALJ failed to consider the possibility that Plaintiff's history of medication noncompliance was itself a manifestation of his illness.  *See Bishop o/b/o K.M.B. v. Comm'r of Soc. Sec.*, No. 1:16-CV-1190 (GTS), 2017 WL 4512163, at *8 (N.D.N.Y. Oct. 10, 2017) ("[W]illful non-compliance with psychiatric medications and treatment . . . could reasonably support a fairly significant deficit in [plaintiff's] self-care abilities.").

evaluation of the medical and other evidence, an appropriate determination of plaintiff's residual functional capacity, and other further proceedings, consistent with this Memorandum-Decision and Order, and it is

ORDERED, that the Clerk enter judgment for **PLAINTIFF**.


Dated: February 22, 2021

Andrew T. Baxter
U.S. Magistrate Judge